IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DANNIE WILEY, #B82633,

    Plaintiff,

v.

SETH MERACLE, *et al.*,

    Defendants.

Case No. 3:24-cv-01348-SPM

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

This case is before the Court on Plaintiff Dannie Wiley's Complaint (Doc. 1). Wiley is an inmate of the Illinois Department of Corrections (IDOC) currently housed at Western Illinois Correctional Center. His lawsuit concerns events that transpired at Pinckneyville Correctional Center (Pinckneyville) in late 2018. Plaintiff's Complaint is now subject to initial review. Under 28 U.S.C. § 1915A, the Court must screen all prisoner complaints to filter out nonmeritorious claims and must dismiss any portion of the complaint that is legally frivolous, malicious, fails to state a claim for relief, or requests money damages from an immune defendant. 28 U.S.C. § 1915A(a), (b). The factual allegations of the *pro se* complaint are liberally construed. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

### BACKGROUND

As an initial matter, this is the second time that Plaintiff has filed a lawsuit concerning events that occurred at Pinckneyville in late 2018. Plaintiff previously pursued a lawsuit that was nearly identical before the undersigned, but he voluntarily dismissed that case in July of 2023. Under Illinois law, a plaintiff may re-file a civil lawsuit within 1 year of voluntary dismissal regardless of statute of limitations problems that might otherwise bar claims. *See* 735 ILCS 5/13-

217; *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 755 (7th Cir. 2021) (finding that under Illinois law, an inmate had one year from the voluntary dismissal of his lawsuit against prison officials to refile his complaint). Plaintiff re-filed the present complaint in May of 2024, so he fits within the one-year timeframe to refile.

In Plaintiff's prior litigation, he was allowed to proceed on three claims against numerous defendants. *Wiley v. Meracle, et al.*, Case No. 20-cv-1140-SPM (Doc. 37). A side-by-side comparison of his operative complaints in his old matter and this new matter reveals that almost all of his allegations remain the same, though he has provided some additional elaboration in his new complaint. Most significantly, in his previous lawsuit he attempted to present due process allegations about related disciplinary proceedings, but the allegations were dismissed because Plaintiff had lost good-time credit and had not yet had his disciplinary proceedings invalidated. In the present Complaint (Doc. 1), Plaintiff also replaces some of the parties who were previously identified as John Does with named individuals, and he re-adds claims against a handful of defendants that were previously dismissed. The Court will assess all claims, new and old.

On October 29, 2018, Lieutenant Johnnie Smith and John Doe 1 (an unknown officer) entered Plaintiff's wing. The two prison employees were quickly approached by multiple inmates before they even made it up the staircase. Plaintiff was waiting his turn to speak to the employees as other inmates complained about dayroom privileges, but he eventually interjected in the conversation and "respectfully" asked why all inmates are punished with limited privileges for the wrongdoing of a few. (Doc. 1 at 16). Smith reached for handcuffs and asked Plaintiff if he wanted to take a trip, implying he would be placed in segregation, but Plaintiff ignored the threat and continued to speak. Smith then approached him and ordered him to cuff up. Plaintiff did not immediately comply, but when Smith threatened to mace him he complied. (Doc. 1 at 17).

Smith and John Doe 1 escorted Plaintiff to segregation. During the walk, Smith continued

to squeeze the cuffs tightly and to bend Plaintiff's wrists, despite Plaintiff not resisting once handcuffed. (Doc. 1 at 17). At the segregation unit, Defendant Meracle approached and ensured Smith that he would "take care of" Plaintiff. (*Id.*). Meracle grabbed Plaintiff's handcuffs and continued Smith's conduct of squeezing the handcuffs and bending Plaintiff's wrists with even greater force than Smith. (Doc. 1 at 18). Meracle and John Does 3 and 4[1] escorted Plaintiff to a cell. Inside the cell, Meracle instructed Plaintiff to kneel on the concrete bunk and to rest his head on the bunk. As Plaintiff moved to comply, he hesitated slightly before lowering his forehead, and in his brief delay Meracle forced his head to the concrete bunk. (Doc. 1 at 18). Meracle then kneeled on Plaintiff's neck and placed a hand on the back of his head. John Does 3 and 4 then quickly grabbed Plaintiff's legs and flattened then until he was prone on the bunk. (Doc. 1 at 18). Meracle released his grip on Plaintiff's head and tore Plaintiff's shirt off while he continued to kneel on his neck. John Does 3 and 4 removed the remainder of Plaintiff's clothes and threw everything in the hallway. Meracle then directed Plaintiff backwards to the cell door where his handcuffs were removed thru the port. (Doc. 1 at 19).

Plaintiff was left naked in the cell. He located the light and discovered that his wrists were bleeding, and he had a large lump on his head. (Doc. 1 at 19). Meracle returned 10 to 15 minutes later and attempted to justify his actions but ignored Plaintiff's requests for medical care. Plaintiff remained in the cold cell without clothing for about 3 hours.

On October 30, 2018, Defendant Ms. Molly, a member of the mental health staff, visited Plaintiff's cell to ask if he needed mental health assistance. (Doc. 1 at 19). Molly viewed Plaintiff's injuries, told him that mental health would come to see him, and advised that he place

---

[1] Plaintiff referred to these two individuals in his factual allegations as "1-2 unknown officers." In the case caption he named "unknown officers 1 and 2, and unknown wing officers 1 and 2." Plaintiff's use of two sets of individuals referred to as 1 and 2 is confusing. The Court will rename the individuals that worked with Meracle as John Does 3 and 4).

3

a kite request to be seen by health care. (Doc. 1 at 20). Later the same day, Plaintiff wrote an emergency grievance about the assault and his need for care, and he also placed a kite request to be seen by healthcare. He indicated that his wrists had been cut by handcuffs and he was experiencing a numb and tingling sensation, he also reported a headache due to his head being slammed into his bunk. (Doc. 1 at 20). Plaintiff's grievance and kite were placed in his doorjamb and Defendant Gregory retrieved the documents. (Doc. 1 at 20). In addition to retrieving the documents, Gregory was also informed on a daily basis that Plaintiff needed medical care, but he simply told Plaintiff to place sick call request slips.

Plaintiff alleges that on October 30, 2018, he told Defendant Counselor Samolinski about the assault and his injuries. He showed Samolinski his visible injuries, but Samolinski merely instructed him to file a sick call slip. (Doc. 1 at 21).

Plaintiff alleges that on or around November 5, 2018, his mother called the prison and spoke to Ms. Lose (a non-party), a counselor. His mother relayed that he did not have any of his personal property (such as hygiene supplies) and he had yet to be seen by medical professionals for his injuries. Lose said she would leave the issues up to Samolinski. (Doc. 1 at 21). Plaintiff alleges that on November 5, 2018, his mother also called and spoke to Defendant Amber J. Alvis, another counselor. Alvis noted the call in Plaintiff's counseling log. On the same day, Plaintiff alleges his mother spoke to Defendant Lt. Franklin[2] of internal affairs. (Doc. 1 at 21). She informed Franklin that Plaintiff had gone a week without his property or hygiene materials, and he needed medical care for the wounds from the assault. (Doc. 1 at 21-22).

On November 5, 2018, Defendant Ms. Hill visited Plaintiff as a member of the mental health staff. Plaintiff informed Hill about the assault and his injuries and also indicated he could

---

[2] It is not clear if this person is actually Lt. Mac Shane Frank that Plaintiff later saw at the Internal Affairs Office on November 26, 2018, or if this is an entirely different person.

not sleep due to the stress of the situation. Hill offered medication to help Plaintiff sleep, but he declined. As for his other injuries, she indicated he would need to file a sick call request. (Doc. 1 at 22). That night Plaintiff wrote another sick call kite and placed it in his doorjamb. The kite was retrieved by an "unknown" officer."[3]

On November 6, 2018, Plaintiff attended a disciplinary hearing where Defendants Charles Heck and Marcus Myers Sr. heard from him about the alleged assault and his need for care. He reported that he had been continually requesting care to no avail. (Doc. 1 at 23).

Around November 12, 2018, Plaintiff composed a second grievance about the assault and his injuries. He also discussed his lack of personal property and hygiene supplies. (Doc. 1 at 23). On November 14, 2018, Defendant Johnnie Smith approached Plaintiff's cell and the two had a verbal exchange. During the conversation, Plaintiff displayed his obvious injuries and asked for medical care. He told Smith his sick call slips were not working. Despite Plaintiff's allegations, Smith insisted he should continue filing sick call slips and walked away. (Doc. 1 at 24).

On November 15, 2018, Counselor Samolinski responded to Plaintiff's second grievance. He indicated that no emergency grievance was ever received about the incident and that staff denied all allegations of excessive force. (Doc. 1 at 24). Plaintiff faults Samolinski for ignoring his complaints about his need for medical care. On November 20, 2018, Plaintiff again informed Samolinski of his needs to no avail. (Doc. 1 at 25).

On or around November 16, 2018, Plaintiff's mother called the prison again and spoke to Lt. Frank of internal affairs. She explained that Plaintiff had yet to receive medical care for his injuries and Frank assured her that he would see to it Plaintiff got any needed medical care. (Doc. 1 at 24-25). On November 20, 2018, Plaintiff's mother spoke to Defendant "the assistant warden"

---

[3] Plaintiff does not specify that this individual was one of the numbered John Does listed in the case caption, and he does not give enough information for the Court to make any assumptions about this.

about Plaintiff's alleged assault, injuries, and need for care. The assistant warden said he would investigate the situation. (Doc. 1 at 25).

On November 22, 2018, Defendant Ms. Mason, a mental health employee visited Plaintiff's cell. Plaintiff informed Mason he was repeatedly denied medical care and showed Mason his injuries. He also complained of his inability to sleep after the incident. Mason offered medication to help Plaintiff sleep, but otherwise redirected him to the sick call process for health care. (Doc. 1 at 25-26).

On November 26, 2018, Plaintiff's mother spoke to Samolinski about his need for care. (Doc. 1 at 26). Samolinski reported told Plaintiff's mother that he had spoken to a lieutenant about getting care for Plaintiff. The same day Samolinski visited Plaintiff and he repeated his needs, but Samolinski merely redirected him to the sick call process. On the same day, Plaintiff was escorted to internal affairs where he met Defendant Frank and another lieutenant. Frank asked what the problem was, and Plaintiff explained that he had been assaulted and needed medical care. (Doc. 1 at 26). Frank initially called Plaintiff a liar but then looked at Plaintiff's forehead and had him escorted to the healthcare unit. (Doc. 1 at 27).

Plaintiff was examined by Defendant Laura Miller, a nurse. She asked why Plaintiff had not placed sick call requests, to which he responded he had placed many slips. Miller and two others who were present insisted that Plaintiff was lying because if he had submitted any slips they would have received them. (Doc. 1 at 27). Plaintiff sensed he would not get anywhere with these nurses and asked for pain pills for severe pain in his upper back, neck, and wrists, as well as his headaches. Miller stated that there was nothing she could do. She then measured the wound on Plaintiff's forehead and attempted to examine his wrists while they were covered by his jacket and secured behind his back. (Doc. 1 at 27-28). Plaintiff received no other treatment.

On November 27, 2018, Plaintiff was escorted to the healthcare unit where he was seen by

Defendants Dearmond and an Unknown Doctor. He was scheduled for a blood pressure check, but he tried to also ask for care for his head and wrists. He described his pain, but the Unknown Doctor told him the visit was limited to blood pressure and that he would need to place a sick call request to be seen for other injuries. Plaintiff insists his injuries were obvious. (Doc. 1 at 28).

On December 4, 2018, Plaintiff's mother contacted Samolinski again to tell him Plaintiff had not yet received treatment. (Doc. 1 at 29). Samolinski said he would email the healthcare unit to inquire about Plaintiff's care.

On December 5, 2018, Plaintiff was visited by mental health provider, Defendant Chris Smith. (Doc. 1 at 30). He informed Chris Smith of his injuries and lack of care. Like others, Chris Smith told him to place a sick call request. (Doc. 1 at 30).

On December 7, 2018, Plaintiff filed a grievance about his ongoing need for care and the alleged inadequacies of the care from Defendants Miller, Dearmond and the Unknown Doctor. (Doc. 1 at 29).

On December 10 and 11, 2018, Samolinski visited with Plaintiff and made a false report in the counseling summary when he documented no issues. Plaintiff alleges that Samolinski only sent a request to the healthcare unit on December 4, 2018, despite knowing for months at that point that Plaintiff was injured. (Doc. 1 at 29).

Plaintiff concludes by stating he received treatment for his injuries upon arrival to Hill Correctional Center around December 12, 2018. (Doc. 1 at 29).

### MERITS REVIEW UNDER 28 U.S.C. § 1915A

Based on the allegations in the Complaint, the Court designates the following claims:

**Count 1:** Eighth Amendment claim against Meracle, Smith, John Doe 1 and John Does 3 and 4 for the use of excessive force against Plaintiff on October 29, 2018.

**Count 2:** Eighth Amendment claim against Meracle and John Does 3 and 4

7

|  |  |
|---|---|
|  | for stripping Plaintiff of his clothes and leaving him in the cell naked. |
| **Count 3:** | Eighth Amendment deliberate indifference claim against Meracle, Johnnie Smith, Molly, Samolinski, Gregory, Alvis, Hill, Mason, the Assistant Warden, Heck, Myers Sr., Mac-Shane Frank, and Chris Smith for their roles in denying Plaintiff access to medical care for his injuries to his forehead and wrists from October 29, 2018, until his transfer on or around December 12, 2018 |
| **Count 4:** | Eighth Amendment deliberate indifference claim against Defendants Miller, Dearmond, and Unknown Doctor for denying Plaintiff care at appointments on November 26, 2018, and November 27, 2018 |

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the First Amended Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly* pleading standard.**[4]

### Count 1

An Eighth Amendment excessive force claim requires an inquiry into "whether force was applied in a good-faith effort to maintain or restore discipline, or [whether it was] applied maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The "core judicial inquiry" for an excessive force claim not the severity of the injury, but whether the force used was 'malicious and sadistic.' *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

Plaintiff alleges that Defendant Johnnie Smith placed the handcuffs on his wrists and then squeezed them too tightly and twisted his wrists while he escorted him to segregation. He notes that John Doe 1 was an officer who accompanied them on the walk to segregation, but he does not

---

[4] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face.").

attribute any actions or knowledge to John Doe 1. Thus, claim 1 may proceed against Smith, but not against John Doe 1.

Upon arrival at the segregation unit, Plaintiff alleges that Defendant Meracle took control of the handcuffs and intensified the squeezing and twisting of his wrists. Meracle and John Does 3 and 4 then took Plaintiff into a cell where Meracle slammed his head into the concrete bunk and John Does 3 and 4 pulled Plaintiff's legs out from under him. Meracle then knelt on Plaintiff's neck as he and John Does 3 and 4 ripped Plaintiff's clothing away. These allegations are sufficient to proceed against Meracle and John Does 3 and 4.

### Count 2

Plaintiff faults Meracle and John Does 3 and 4 for leaving him naked in a cold cell for hours after the incident. This claim may also proceed.

### Count 3

Prison officials and medical staff violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs. *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017). To state such a claim, a prisoner must plead facts and allegations suggesting that (1) he suffered from an objectively serious medical condition, and (2) the defendant was aware of the serious condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Generally, non-medical prison officials may defer to medical providers, unless they know or have reason to know that an inmate has a serious injury that is not receiving appropriate treatment. *Id.* at 527 (a non-medical official can be liable under the Eighth Amendment if they have actual knowledge or reason to believe prison doctors or assistants are mistreating or failing to treat an inmate with a serious need).

Plaintiff faults Defendants Meracle and Johnnie Smith for being aware of his injuries but

9

refusing to secure any medical care. Each individual participated in the original assaults. Plaintiff also claims that each defendant observed his obvious injuries after the incidents and walked away. Plaintiff also alleges that the day after the assault he placed a sick call request which Defendant Gregory retrieved from his cell, and he told Gregory on a daily basis he needed care for visible wounds, but Gregory refused to render any aid. These allegations about Meracle, Johnnie Smith, and Gregory, that they visited Plaintiff's cell, saw his injuries, and refused any assistance, are sufficient to proceed.

      Plaintiff also faults a group of mental health professionals for instances when they visited his cell, saw his visible injuries, and refused to offer any assistance other than the advice that he uses the sick call slip process to request care. He alleges that he told the individuals that the sick call process was not working for him, but nothing additional was offered. Because Plaintiff alleges that he had wounds that were visibly obvious, and he informed these individuals that the sick call process was not helping, he may proceed against them on the theory that they had actual knowledge his needs were being ignored but failed to take any action. Thus, count 3 may proceed against Defendants Molly, Hill, Mason, and Chris Smith.

      Plaintiff also faults Counselor Samolinski, who allegedly visited his cell on many occasions and fielded calls from his mother. He alleges Samolinski knew about his need for medical care for more than a month but failed to act other than advising him to use the sick call process. These allegations are also sufficient. Likewise, Plaintiff alleges Defendant Alvis (another counselor) spoke to his mother on the phone about his needs, documented the needs in his counseling log, and failed to take any other action. Count 3 may proceed against Samolinski and Alvis on these allegations of inaction.

      Plaintiff alleges that Defendants Heck and Myers Sr. saw him during his disciplinary hearing, observed his visible injuries, and ignored his pleas that he had been unable to secure any

medical care. As with other prison officials who visited his cell and refused to help him secure care, these allegations are sufficient to proceed.

Finally, Plaintiff faults Defendants Frank of internal affairs, and an Assistant Warden for failing to timely respond to knowledge that he needed medical care. As for Frank, he allegedly learned of Plaintiff's situation via a phone call from Plaintiff's mother on November 16, 2018, but he did not summon Plaintiff to internal affairs until November 26, 2018, at which time he eventually sent Plaintiff to the healthcare unit. It is plausible that Frank's delay in acting could amount to deliberate indifference, so Count 3 may proceed against Frank. As for the Assistant Warden, Plaintiff alleges that his mother spoke to this individual on November 20, 2018, and he or she said they would "check on it." This is most similar to Plaintiff's allegations against counselor Alvis, who also fielded a phone call and did not act. However, Plaintiff supplied the counseling log indicating Alvis fielded this call, noted the serious allegations, and did not act. By contrast, Plaintiff has no support about what was conveyed to the Assistant Warden or how that individual responded. The Court finds that the allegations against the Assistant Warden are too threadbare. Thus, count 3 shall survive against Defendant Frank, but not the Assistant Warden.

In sum, count 3 may proceed against Defendants Johnnie Smith, Meracle, Gregory, Molly, Hill, Mason, Chris Smith, Samolinski, Alvis, Heck, Myers Sr., and Frank, and it shall be dismissed as to Defendant Assistant Warden.

**Count 4**

On November 26, 2018, Plaintiff alleges that his injuries were examined by Defendant Laura Miller, but she refused to offer any care, including even basic pain medication. Plaintiff's allegations support the inference that he still had visible wounds at this visit because Miller allegedly used a tape measure to attempt to measure the wound on his forehead. He also alleges he told Miller he was in serious ongoing pain, but she ignored his statements. These allegations

11

are sufficient to proceed against Miller.

He alleges that on November 27, 2018, he was seen by Defendants Alisa Dearmond and an Unknown Doctor for a blood pressure check. He tried to draw attention to his wounds on his forehead and wrists, but they refused assistance and redirected him to the sick call process. These allegations are also sufficient to proceed.

### Unknown (John/Jane Doe) Defendants

Plaintiff has been allowed to proceed against John Does 3 and 4 and the Unknown Doctor. Plaintiff must file a Notice with the Court within 21 days giving a physical description of these individuals, as well as any information he might have about their positions at the prison, nicknames they may have, etc.. The Warden of Pinckneyville will be added to this lawsuit in official capacity only to participate in an exchange of information about the identity of these three individuals. If Plaintiff fails to file a timely notice, these individuals may be dismissed without prejudice.

### DISPOSITION

The Complaint states colorable claims in **Count 1** against Meracle, Johnnie Smith, John Doe 3 and John Doe 4; in **Count 2** against Meracle and John Does 3 and 4; in **Count 3** against Meracle, Johnnie Smith, Molly, Hill, Mason, Chris Smith, Gregory, Samolinski, Amber Alvis, Mac-Shane Frank, Charles Heck and Marcus Myers Sr.; and in **Count 4** against Laura Miller, Alisa Dearmond, and Unknown Doctor. **Count 1** is **DISMISSED** without prejudice against Defendant John Doe 1, and **Count 3** is **DISMISSED** without prejudice as to Defendant Assistant Warden. Plaintiff has also failed to state a claim against John Doe 2 (unknown officer), and John Does 1 and 2 (unknown wing officers). The Clerk of Court is **DIRECTED** to **ADD** John Does 3 and 4 to the docket sheet. The Clerk of Court is **DIRECTED** to **TERMINATE** Defendants Assistant Warden, John Doe 1 (unknown officer), John Doe 2 (unknown officer), John Does 1 and 2 (unknown wing officers).

The Clerk of Court is **DIRECTED** to **ADD** the Warden of Pinckneyville as a party in this case for the sole purpose of assisting with John Doe identification. The Warden need not file an answer. Plaintiff is **ORDERED to file a Notice within 30 days** giving a physical description of John Does 3 and 4 and the Unknown Doctor. Once Plaintiff has filed a notice and the Warden has entered an appearance, the Court will set a schedule for next steps.

The Clerk shall prepare for Defendants Seth Meracle, Johnnie Smith, Mac-Shane Frank, Charles Heck, Marcus Myers Sr., Laura Miller, Alisa Dearmond, Robert J. Samolinski, Y. Mason, Ms. Molly, Ms. Hill, Chris Smith, Amber J. Alvis, Sgt. Gregory, and the Warden of Pinckneyville (official capacity only): (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint (Doc. 1) and this Memorandum and Order to these Defendant's place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on the Defendant, and the Court will require the Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk and shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this**

13

**Merit Review Order**.

Plaintiff is **REMINDED** that he is under a continuing obligation to keep the Clerk of Court and the opposing parties informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

The Clerk of Court is also **DIRECTED** to enter the standard HIPAA protective order in this case.

**IT IS SO ORDERED.**

**DATED:  November 19, 2024**

*s/ Stephen P. McGlynn*
**STEPHEN P. MCGLYNN**
**United States District Judge**